Harradon R. Randall v. Commissioner.
Randall v. Commissioner
Docket No. 65982.
United States Tax Court
T.C. Memo 1960-77; 1960 Tax Ct. Memo LEXIS 212; 19 T.C.M. (CCH) 406; T.C.M. (RIA) 60077; April 19, 1960
*212 The respondent's disallowance of a claimed bad debt deduction approved where it appears that a debtorcreditor relationship was not intended and where, in any event, it has not been established that any debt that existed became worthless in the taxable year. Harradon R. Randall, 615 Market Street, Ashland, Pa., pro se. Albert Squire, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined a deficiency in income tax of the petitioner for the year 1952 in the amount of $5,011.59. The issue is whether petitioner is entitled to a bad debt deduction in the amount of $8,000. Findings of Fact The petitioner is an individual residing at Ashland, Pennsylvania. He filed an income tax return for the year 1952 with the district director of internal revenue *213 for the district of Philadelphia, Pennsylvania. Petitioner is a graduate mining engineer. He was born and raised in the anthracite coal region of Pennsylvania and has engaged in numerous business ventures in the anthracite coal industry. At the time of the hearing his business consisted of selling coal. In 1917 the M. A. Hanna interests acquired certain coal properties in the anthracite coal region, including a mine at Lytle, Pennsylvania. Thereafter the market for anthracite coal drastically declined and by 1939 these interests were preparing to abandon the operation of the mine at Lytle. This would have resulted in the loss of livelihood by miners in that region. The coal miners' union there asked petitioner to take over the mine. However, he had no desire to do so, but agreed to assist. He and others were successful in getting the Hanna interests to execute a lease on the mine. A corporation, Primrose Coal Company, was organized in 1939 to take the lease. Its authorized capital stock consisted of 300 shares of common stock, par value $10 per share (carrying the voting rights), and 7,200 shares of cumulative preferred stock, par value of $10 per share. The common stock was issued *214 equally to three groups, namely, the coal miners' union, the foremen, who are also called monthly men, and the local citizens. The miners and the monthly men took preferred stock in lieu of their first month's wages. Each of the three groups placed five men on the board of directors. The petitioner acted as one of the directors, representing the community of Minersville, Pennsylvania, from 1939 to 1941. He had purchased four shares of preferred stock and one share of common stock at a cost of $50. The petitioner had lived among these miners and foremen for many years and had attended school with them; both he and his father before him were interested in their welfare; and his principal interest in assisting in setting up the corporation was to provide jobs for them. The only benefits he expected to get out of the enterprise were such indirect benefits as he and his family might receive politically. It took about six months to get the corporation organized and operating. In the interim it was necessary to provide money to the unemployed foremen whom the corporation intended to employ, in order to meet their current living expenses and to insure that they would not take jobs elsewhere. *215 The petitioner advanced money for this purpose to Dave Hinken, an assistant mine foreman, whom the petitioner trusted and whom the men respected. He continued from time to time in 1939 and 1940 to advance money as Hinken advised him of the individual needs of the men, and Hinken turned the money over in relatively small amounts to such others, the total so advanced by the petitioner to Hinken being at least $8,000. Of the amount advanced Hinken retained about $1,500 for his own needs. It was intended that Hinken would collect the advances from the foremen after the project had commenced and they had gone back to work, in which case Hinken would then repay the petitioner. At the time the advances were made the petitioner did not receive any notes or other evidences of indebtedness or security from Hinken, and there was no provision for the payment of interest. The petitioner had no direct dealing with the other foremen. The petitioner's reason for advancing this money was because of his acquaintanceship with and his interest in the foremen, and his motives were at least in part philanthropic. No amounts were ever collected by Hinken from the foremen, and Hinken never made any payments *216 to the petitioner. Two of the foremen were killed in a mine explosion in 1943. At some time Hinken told the petitioner that he could not collect the money and offered to be responsible, but petitioner did not hold him responsible because Hinken had done him a favor by distributing the money to the foremen to keep them available. The mine closed down in 1951 and in that year Hinken died. Up to the time of Hinken's death the petitioner had made no effort to collect any of his advances, other than to ask Hinken from time to time whether he had collected any money from the foremen. He never did ask Hinken for repayment. When Hinken died his estate consisted only of certain oil land in Florida, which he had received from a relative and which had little value. On June 28, 1952, the petitioner was given a demand note for $8,000, with interest at four per cent, signed by "E. H. Martz - Trading as Modern Metropolitan Management." E. H. Martz was Hinken's eldest daughter. At the time E. H. Martz gave petitioner this note, she stated that if the family paid her this money she would pay the note. The petitioner engaged a lawyer to investigate the financial status of E. H. Martz, who advised *217 petitioner on January 23, 1953 that she had real property in Minersville and Philadelphia, but that it was encumbered by prior claims in amounts equal to or in excess of its value. The note had no value when it was given. In his return for the year 1952 the petitioner claimed a deduction of $8,000 as "Worthless Loan - Modern Metropolitan Management…." In the notice of deficiency respondent held that this item did not qualify as a deduction under section 23 of the Internal Revenue Code of 1939. Opinion The respondent takes the position that the advances totaling $8,000 did not constitute debts, but that even if they did they did not become worthless in the year in question, 1952. Section 23(k)(1) of the Internal Revenue Code of 1939 provides for the deduction of "Debts which become worthless within the taxable year." A prerequisite to a bad debt deduction is a clear showing that the parties intended to create a debtor-creditor relationship and that a debt in fact existed. Evans Clark, 18 T.C. 780, affd. (C.A. 2), 205 F. 2d 353. In his return the petitioner claimed a deduction of $8,000 as being a worthless loan to Modern Metropolitan Management, *218 based upon the note given by Hinken's eldest daughter after Hinken's death. At the hearing the petitioner's explanation, as set forth in our Findings of Fact, is that this amount of $8,000 in reality represented advances made by him in 1939 and 1940 to Hinken, who in turn distributed the money, except for $1,500 which Hinken himself retained, to other mine foremen. The petitioner testified that he made the advances in order to meet the current living expenses of the unemployed foremen in order that they would be available for work when the cooperative mining project commenced operations. He further testified that he knew these foremen, had gone to school with some of them, and that his motive in making the advances was philanthropic. We think that certainly his motive was at least partly philanthropic. In addition, his testimony and the record as a whole indicate that he was interested in the community, in maintaining his prestige therein, and in retaining the good-will of the foremen, partly for the purpose of any indirect political benefits which might result to him and his family. Hinken gave the petitioner no note or other evidence of indebtedness and the foremen gave no notes. *219 Indeed, the record does not show the names of any of these foremen. The foremen did not repay Hinken and Hinken never did repay any amount to the petitioner. The petitioner made no efforts whatever to collect any amounts from either Hinken or from the other foremen. Although Hinken offered to be responsible for the advances, the petitioner did not attempt to hold him responsible because he considered that Hinken had done him a favor in distributing the amounts to the foremen. All of these circumstances lead us to the conclusion that there was no definite and binding obligation undertaken by Hinken to repay the advances to the petitioner at all events, as would be necessary to the creation of a debt owing to the petitioner within the meaning of the statute. It would seem that Hinken's obligation to the petitioner would in any case be limited to the amount of $1,500 which Hinken himself used. But even as to that the petitioner never made a demand upon Hinken, and it may well be that the character of this advance to Hinken falls within the same category as the advances which were received by the other foremen. It is true, of course, that after Hinken's death, which occurred in 1951, Hinken's *220 eldest daughter executed a note dated June 28, 1952, for $8,000, as described in our Findings of Fact, and this might be considered as some recognition by Hinken's family that Hinken did have an obligation to repay the petitioner. However, we do not think this is determinative since, as stated above, so long as Hinken was alive the petitioner did not consider that Hinken was obligated to him. Accordingly, even if there was at the beginning an obligation by Hinken to repay the petitioner the advances made, the record indicates that the petitioner had forgiven the obligation. Even if it were assumed, for purposes of argument only, that there was a debt or debts owing to the petitioner as a result of his advances, it would be incumbent upon the petitioner to prove that the debt or debts became worthless within 1952, the taxable year in question. The record contains no evidence whatever to establish the financial condition of the foremen who ultimately received most of the advances. Nor is there evidence as to the financial condition of Hinken during the interim from the time the advances were made in 1939 and 1940 until the time of his death in 1951, other than that Hinken left no estate *221 except some land in Florida which had little value. The petitioner stated that his reason for deducting the $8,000 in 1952 was that when Hinken died he felt that all hope of redemption was gone, whereas up to that time there was some possibility of recovery. There is no evidence to show whether there was an administrator or executor of Hinken's estate. Hinken's eldest daughter signed the note as a representative of an organization by the name of Modern Metropolitan Management, as to which there is no evidence whatever. She may have signed in her individual capacity or as representative of her father's estate. The petitioner testified there was an oral understanding that she would pay the note only if the family turned over to her money to pay it. But whatever her capacity, the note was worthless when given. The petitioner so testified, and the record shows that Hinken's land in Florida had little value, and the only property E. H. Martz owned bore encumbrances in amounts equal to or greater than the value of the property. In this state of the record we cannot conclude that the petitioner has shown that any debt or debts that existed became worthless in 1952. For all that appears *222 they might have become worthless in years long prior to the year in question, or at the latest in the year 1951, when Hinken died. Under the circumstances, we approve the respondent's disallowance of the claimed deduction. Decision will be entered for the respondent.